

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

January 18, 2024

**BY EMAIL AND ECF**
Honorable Lorna G. Schofield
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

    Re:    *United States v. Konrad Bicher*, **S1 22 Cr. 589 (LGS)**

Dear Judge Schofield:

    The Government submits this letter in advance of sentencing for defendant Konrad Bicher (the "defendant"), which is scheduled for January 29, 2024. On June 26, 2023, the defendant pled guilty to a one count information (the "Information") charging wire fraud, in violation of 18 U.S.C. § 1343, pursuant to a plea agreement (the "Plea Agreement"). In the Plea Agreement, the parties stipulated to a sentencing range pursuant to the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") of 46 to 57 months' imprisonment (the "Stipulated Guidelines Range"), based on an offense level of 22 and Criminal History Category of II. In the Presentence Investigation Report ("PSR"), the Probation Department ("Probation") agrees with the parties' calculation of the offense level, but finds that the defendant has four criminal history points, and therefore a Criminal History Category of III and Guidelines range of 51 to 63 months' imprisonment (the "PSR Guidelines Range").[1] Probation recommends a sentence of 51 months. The defendant has requested an unspecified variance from the Stipulated Guidelines Range.

    The defendant operated a yearslong scheme in which he defrauded New York City landlords and American taxpayers. During the scheme, he enriched himself by abusing legal protections and stealing from government programs intended to help people in need during the Covid-19 pandemic. The defendant's scheming was no isolated incident or momentary lapse in judgment – to the contrary, it lasted for years, and it escalated even after he knew that his victims were on to him and were willing to initiate litigation to (unsuccessfully) stop his conduct. In

---

[1] Both the PSR and the Plea Agreement apply two criminal history points pursuant to U.S.S.G. § 4A1.1(d) because the defendant committed the instant offense while under a criminal justice sentence, specifically, probation. This was a correct assessment of criminal history points pursuant to the November 1, 2021 edition of the Guidelines Manual. However, the 2023 edition of the Guidelines Manual should apply at sentencing, and pursuant to the revised § 4A1.1 in that edition, the defendant would not receive two additional criminal history points. The result is that the defendant should be in Criminal History Category II, rather than III, and the resulting Guidelines range is 46 to 57 months' imprisonment – i.e., the Stipulated Guidelines Range.

addition, the defendant – who has two prior criminal convictions, including a 2015 conviction for engaging in similar conduct to the instant offense – demonstrated an utter lack of remorse during his scheme. Even since his criminal charges, the defendant appears unable or unwilling to recognize the seriousness of his wrongdoing and these proceedings.

For these reasons, and as discussed further below, the Court should impose a sentence of 51 months' imprisonment – i.e., the sentence recommended by Probation, and a sentence within the Stipulated Guidelines Range.

### A. Factual Background

#### 1. The Schemes Generally

From at least in or about February 2019 through in or about April 2022, the defendant fraudulently operated several purported real estate businesses. While the defendant pled guilty to a single fraud scheme, the scheme had two factually distinct components, which were initially charged as separate schemes and are addressed separately below: first, a scheme in which the defendant leased apartments (either personally or through associates) and then rented them out on a short term basis (the "Rental Property Scheme"), and, second, a scheme in which the defendant fraudulently obtained loans pursuant to the Paycheck Protection Program for struggling businesses during the Covid-19 pandemic (the "PPP Scheme").

#### 2. The Rental Property Scheme

Beginning in at least February 2019, Bicher and/or individuals working at his direction rented apartment units in Manhattan pursuant to lease agreements which required that the lessee make monthly rental payments. The leases also included clauses that either prohibited the lessee from renting the units to third parties on a short-term basis and/or included clauses that prohibited the lessee from subletting the units to third parties without written consent of the owner. Despite those requirements, Bicher neglected to make required rental payments, failed to vacate the premises after the expiration of the lease, and generated income for himself by renting the units on a short-term basis to others, including through the use of Airbnb and other online marketplaces for short-term rentals.[2]

In the charging documents, the Government identified at least 18 apartment units for which Bicher engaged in this scheme. However, as indicated in the PSR, the Government understands that Bicher ran this scheme with more than these 18 units – and, in fact, has identified at least three additional units and victims which it intends to include in the restitution order. For the 18 units identified in the charging documents, Bicher and his associates failed to make more than $1,000,000 in rental payments between in or about July 2019 and in or about April 2022. During

---

[2] The Government has not alleged that Bicher never made any rental payments for any properties that were part of his scheme. It appears that Bicher did make some rental payments for certain properties, particularly early on in a lease term. There are instances, however, where Bicher never made any payments for a particular apartment.

this period, Bicher caused the units to be listed for short-term rent on multiple online marketplaces for short-term rentals, resulting in at least $1,170,000 in rental income to Bicher and his associates from Airbnb – just one of the websites that Bicher used to generate profits from the buildings.

Throughout the course of this scheme, the lessors of the units made numerous efforts to recover rental payments from Bicher and/or to stop Bicher from continuing to rent the units on a short-term basis, including by initiating civil litigation against Bicher. In order to fend off these lawsuits, Bicher relied on legal protections intended to benefit tenants – including tenant protections adopted in connection with the Covid-19 pandemic. But these efforts required Bicher to make false statements and representations to the courts in order to avoid paying rent. In order to fend off lawsuits, Bicher fraudulently claimed in court that he was suffering from Covid-19 related hardships and lied about his residency and use of the units. Bicher told affirmative falsehoods and even falsified documents and evidence to support his claims of hardship and to avoid either paying rent and/or relinquishing the unit. Indeed, Bicher was not actually living in any of the apartments for which he sought the refuge of tenant protections, nor was Bicher suffering from Covid-19 related hardships. In fact, during the Covid-19 pandemic, Bicher was living in Florida and traveling for leisure while continuing to claim Covid-19 related hardships and generating illicit profits for himself via his fraud scheme, including the PPP Scheme.

Bicher also had several individuals working for him and helping him maintain and operate the rental properties. These individuals assisted Bicher in operating the rental properties, and were paid by Bicher and/or out of Bicher's profits.

   a. <u>The Defendant Continued the Rental Property Scheme Despite Knowing Landlords Objected to His Use of Airbnb and Would Sue to Stop Him</u>

In his sentencing submission, the defendant argues that many landlords knew he was renting their units on Airbnb, yet continued renting to him. But even if that was the case for *some* landlords, the defendant knew from very early on in the scheme that many others would never have rented to him had they known that he would be renting the units on Airbnb, and in fact were willing to initiate legal proceedings to stop the defendant's conduct. For example, on July 23, 2019, Bicher learned from an associate who helped Bicher manage his rental units and operate his scheme ("CC-1") that an individual who had rented a unit from Bicher on Airbnb had informed building staff about the rental. Bicher and CC-1 had the following exchange (typos in original):

| | |
|---|---|
| Bicher: | *Turn all my listings off ASAP.* |
| CC-1: | *Ok* |
| Bicher: | *How tf is that even possible* |
| Bicher: | *This is not good at all* |
| Bicher: | *This happened twice now* |

| | | |
|---|---|---|
| Bicher: | | *The [Address-1] guest are to go to [Address-2]* |
| Bicher: | | *I will meet you with the keys at [Address-2].* |
| | | *Call 15-20 minutes prior to arrival, the management does not like Airbnb so to avoid the door man and problems I will meet you out front and walk you to our home which is a cross the street. My cell is: [number]* |
| Bicher: | | *This is the message that must be sent* |
| Bicher: | | *With who ever is running it.* |
| Bicher: | | *\*IMPORTANT:*<br>*To make your stay enjoyable, if anyone during your stay KNOCKS or ASK who you are, don't open the door or talk to them, mention your just a FRIEND or FAMILY and not AIRBNB and not PAYING for your stay. New York City is changing the laws and Airbnb is being prohibited ⃠ \** |
| CC-1: | | *I am the one doing it.* |
| Bicher: | | *The message was sent to them?* |
| CC-1: | | *Yes!* |
| Bicher: | | *It's been 2.5 years since any of my guest said anything about Airbnb.* |
| CC-1: | | *Bro I am sorry but they didn't followed it* |
| Bicher: | | *What did the door man say??* |
| CC-1: | | *That this is illegal and took the keys from her* |
| Bicher: | | *Fuck* |
| Bicher: | | *And the listings are still on too* |
| Bicher: | | *I just turned them* |
| Bicher: | | *Off* |
| CC-1: | | *I am logging in* |

| | |
|---|---|
| Bicher: | *In a case like this the listings need to be turned OFF* |
| Bicher: | *It's to mate I turned them off already* |
| Bicher: | *Where are the guest going when checking them in??? It's impossible if the guest are fully warned* |
| Bicher: | *I had it for 2.5 years and never had this now I have no clue what's going on. Short cuts or what with VAs idk but that's a 30k unit I can't have this* |
| Bicher: | *Same with [Address-3] they told everyone there Airbnb guest* |
| Bicher: | *Did the guest say which apt???* |
| Bicher: | *Apt 4D?* |
| CC-1: | *I am trying to contact them but they don't answer* |
| Bicher: | *They have me in court twice now for law suit cause of Airbnb* |
| Bicher: | *Nobody is taking this shit serious with warning guest. No signs no nothing and I am the one having to go today to install all that fucking shit* |
| CC-1: | *Bro I did tell them. [Individual-2] told me already that he had all the signs to put everywhere.* |
| ... | |
| ... | |
| Bicher: | *That's 650 dollars lost today if they don't stay plus back to court with the landlord. He hates me in that building and the last thing I ever need is guest talking to door man. There to go to [Address-2] and never have the real address until they are literally there to avoid standing out front.* |

As this communication makes clear, by July 2019, Bicher was unambiguously aware that he was misleading and defrauding landlords in order to operate his scheme.[3] He also knew that landlords would be willing to sue him to stop his conduct. This communication is just one such example; the defendant's communications with CC-1 are replete with references to landlords

---

[3] The communication also suggests that Bicher had been renting apartments on Airbnb without consent of the apartments' owner for at least two and a half years before July 2019.

making efforts to stop the defendant's scheme and/or about ongoing litigation. By the time of the defendant's arrest in June 2022, he was engaged in numerous civil proceedings with countless landlords. Nevertheless, the defendant continued to enter into new leases on false pretenses and for the purpose of renting apartments on Airbnb and through other short term rental websites, and continued not to make necessary rental payments as required by the leases.

    b. <u>The Defendant Abused and Took Advantage of Legal Protections Intended to Help Those in Crisis</u>

The defendant executed the Rental Property Scheme by knowingly and intentionally abusing legal protections and programs implemented to protect vulnerable New Yorkers, particularly during the Covid-19 pandemic. The defendant saw the hardships caused by Covid-19 as an opportunity. For example, on April 20, 2020, Bicher and CC-1 discussed the Covid-19 pandemic, and specifically how it would be difficult for landlords to evict tenants from apartments. In that communication, Bicher wrote, among other things:

  Bicher:  *Now bro I will become evil.*

  Bicher:  *And rape every single landlord in NYC*

  Bicher:  *Every landlord now is gonna be fuckeddddd*

  Bicher:  *I will fuck everything up now*

On the same day, Bicher told CC-1 to tell a landlord who had been requesting rent the following:

  Bicher:  *Tell him no rent until this pandemic is over and then you'll pay. Which we won't pay…*

A few days later, on April 23, 2020, Bicher wrote the following:

  Bicher:  *Andddd I am booking 4-5 Apts om* [sic] *Airbnb in NYC for over 30 days. Will squat and sue and stay for 1.5-2 years. Free cash. 5 units at 3-4K a month is 15-20k free money.*

A month later, on May 28, 2020, Bicher wrote to CC-1 in connection with a court proceeding in which Bicher was attempting to keep a unit that he was using to rent on Airbnb:

  Bicher:  *I can't wait for Monday. After we get the possession of the unit, I will sent the court papers to all the other landlords and tell them this is what happens when they shut down key fobs etc. just a message to them that's all.*

In order to maintain the apartment units and fend off litigation from landlords, Bicher had to lie and pretend that he was a legitimate tenant who actually resided at the apartments at issue. As explained above, this was untrue; at no time did Bicher live in the units subject to litigation during the Covid-19 pandemic. Instead, Bicher was living in Florida and traveling around the world without a care in the world. As Bicher himself put it, he was enjoying "free cash" and "free money" by collecting rent from Airbnb tenants while refusing to pay his own rent. Bicher took advantage of a global pandemic to "rape every single landlord in NYC" for his own enrichment.

### 3. The PPP Scheme

In addition to profiting on apartments that he did not own and was not making required rental payments for, between at least April 2021 and July 2021, Bicher also obtained multiple government-guaranteed PPP loans intended to provide relief to small businesses during the Covid-19 pandemic. Specifically, entities controlled by Bicher received the following loans:

| Company | Month Loan Received | Amount |
|---|---|---|
| Luxe Vita Group LLC | April 2021 | $142,197 |
| The Konrad Foundation LLC | May 2021 | $141,562 |
| NY Approved Rentals LLC | May 2021 | $141,875 |
| Luxe Vita Group LLC | June 2021 | $142,197 |

**Total = $567,831**

Each of the applications used to obtain these loans identified Bicher as the owner and manager of the company. Each application also included false information, including fake copies of tax returns and fraudulent claims about the company's business operations, revenues, and intended use of loan funds.

Bicher also submitted fake tax returns in connection with these applications – that is, a copy of a purported tax filing which Bicher claimed had been filed by the entity with the IRS, but which, in fact, had not been filed. (In fact, the entity had not filed any tax return and/or reported its income on Bicher's personal tax returns at all.) On one occasion, after Bicher was asked to submit a tax return, Bicher hired an accountant ("Accountant-1") to prepare a tax filing for him. Accountant-1 sent Bicher the tax filing, signed by Accountant-1, and asked Bicher if Bicher would like Accountant-1 to file on Bicher's behalf. Bicher did not ask Accountant-1 to file the tax return, and the tax return was never filed. However, unbeknownst to Accountant-1, Bicher submitted the (never filed) tax return, with Accountant-1's signature, to the lender for purposes of obtaining the PPP loan.

Not only did Bicher fraudulently obtain the PPP loans, but he also spent the funds in a manner impermissible under the terms of the PPP. Specifically, Bicher transferred the funds to his personal bank accounts and/or withdrew them for cash.

Just as with the Rental Property Scheme, the PPP Scheme reflects how the defendant was willing to continue lying and stealing well after litigation was brought against him by victim landlords. The PPP Scheme occurred in *April 2021* – nearly two years after the text exchange with

CC-1 relating to a landlord learning about Bicher's use of Airbnb. And, needless to say, the PPP Scheme also demonstrates Bicher's willingness to abuse programs intended to help people in crisis also presented itself in his PPP Scheme. Bicher saw the PPP as a piggybank that he could exploit for his own purposes. In a message dated April 6, 2021, Bicher wrote the following in response to learning from an individual who was assisting Bicher in obtaining the loans that a loan had been approved:

>   Bicher:    *That's incredible, heck yeah! Thank you!*
>
>   ...
>
>   Bicher:    *Yes gonna put this 75k into new homes here in Miami and Airbnb the hell outta them.*

In addition, communications on Bicher's phone reflect that he offered to obtain PPP loans for family members and other associates.

### 4. The Defendant's Lack of Remorse

While the defendant has accepted responsibility for his crime and is entitled to a three-point reduction in the offense level pursuant to U.S.S.G. § 3E1.1, the Court should consider the defendant's lack of remorse in fashioning the appropriate sentence pursuant to 18 U.S.C. § 3553(a). As the above factual recitation makes clear, the defendant was on notice throughout his scheme that his victims were on to him and wished to stop his conduct. But at no time, either during or after his scheme, has the defendant demonstrated any remorse for his conduct.

#### a. The Defendant Bragged About His Exploits to the Media and Friends

During the course of the scheme, the defendant referred to himself as "the Wolf of Airbnb" – which he explained in a February 2021 message to CC-1 was "mean[t]" to refer to the "Wolf of Wall Street." In early 2022, when the media caught wind of Bicher's exploits, Bicher and CC-1 laughed again about the moniker, having the following exchange on January 27, 2022:

>   CC-1:    *I can see the news!!*
>
>            *Wolf of Airbnb, The Landlord's Nightmare.*
>
>   Bicher:  *Hahahaa it's gonna go viral.*

About a month later, on March 22, 2022, when the New York Post ran an article about Bicher and his scheme, Bicher sent a link to the story to CC-1.[4] In the article, Bicher was quoted as saying:

> *Asked why he calls himself the "Wolf of Airbnb," Bicher responded in a text to [a different media outlet], "The Wolf of Airbnb: It means someone who is hungry and ruthless enough to get on top of the financial ladder. They compare the ferocity to that of a wolf, because wolves are territorial, vicious and show no mercy when provoked*

Bicher's first order of business after sending the news report to CC-1 was to ask CC-1 whether the "Airbnb accounts are safe" – meaning, whether the apartments he was posting for rent on the website were still available for leasing. CC-1 responded that "so far everything online." Bicher replied, "I think we are safe now…[c]ause nothing is under my name." Clearly, Bicher was not concerned about his wrongful conduct being written about in the newspaper; instead, he was solely focused on whether the media reports would prevent him from being able to successfully operate his scheme. And he was able to continue doing so because he hid his involvement in the apartments from Airbnb.

CC-1 then asked Bicher whether he had actually provided the quote about the "Wolf of Airbnb" attributed to him in the March 22, 2022 article. Bicher responded, "Yes lol" and "That's all I told them."

### b. The Defendant's Deletion of Text Messages

Bicher was arrested on June 29, 2022, as he attempted to board an airplane in Florida. Data from Bicher's phone reflects that, some time after he was taken into custody, but apparently before his phone was seized, Bicher texted CC-1: "Dotm [sic] text me" and, a few seconds later, "With fbi." Bicher then deleted his entire text thread with CC-1.

Despite Bicher's efforts to destroy evidence, the Government was able to recover the text thread with CC-1 from Bicher's phone – or at least was able to recover the thread back to June 2019. The Government ultimately concluded that it would not seek the obstruction of justice enhancement for this act.[5] Nevertheless, the fact that the defendant deleted his text messages while

---

[4] *See* Priscilla DeGregory, New York Post, "'Wolf of Airbnb' accused of running illegal rental out of posh NYC pad," available at https://nypost.com/2022/03/21/wolf-of-airbnb-accused-of-running-illegal-rental-out-of-nyc-pad/ (last visited January 18, 2024).

[5] *See* U.S.S.G. § 3C1.1, Application Note 4(D): "destroying or concealing evidence that is material to an official investigation or judicial proceeding…or attempting to do so" is an example of "the types of conduct to which" the obstruction of justice enhancement applies, "however, if such conduct occurred contemporaneously with arrest…it shall not, standing alone, be sufficient to

in custody reflects a lack of remorse and disregard for the significance of these proceedings. It also bears noting that while the Government recovered three years' worth of communications between Bicher and CC-1, the Government cannot be certain that there were no other communications with CC-1 – or other data on the defendant's phone – that Bicher successfully deleted and which the Government was not able to recover.

### c. Statements After the Guilty Plea Proceeding

On June 26, 2023, the defendant pled guilty. While the defendant clearly accepted responsibility and allocuted to his guilt during the change of plea proceeding in Magistrate Court, outside the courthouse after the guilty plea, the defendant remarked to reporters that he had a "fantastic story" to tell, and that his "story will come out, just not today."[6] According to that report, the defendant made these remarks while being photographed outside of 500 Pearl Street by what the reporter described as "what appeared to be a private camera crew outside court." *Id.* Indeed, photographs of the defendant outside the courthouse were included in other media reports that day.[7]

### d. The Defendant's Sentencing Submission

The defendant's lack of remorse also runs through his sentencing submission. Even today, as he faces sentencing, rather than own up to his fraudulent and wrongful conduct and seek forgiveness, the defendant continues to blame his victims for his crimes. The defendant's sentencing submission is replete with finger pointing and accusations, as if it is someone else's fault that he lied to obtain PPP loans or during legal proceedings to avoid paying rent.

### B. Procedural History and Guilty Plea

The defendant was arrested on June 29, 2022 pursuant to a criminal complaint (the "Complaint") charging one count of wire fraud, in violation of 18 U.S.C. § 1343, in connection with the Rental Property Scheme. On October 27, 2022, a grand jury returned a three-count indictment (the "Indictment"), charging the defendant with two counts of wire fraud – i.e., separate counts for the Rental Property Scheme and the PPP Scheme – and one count of aggravated identity theft, in violation of 18 U.S.C. § 1028A, in connection with the defendant's use of the name of a Florida-based accountant to submit the false tax filings to PPP lenders.

---

warrant an adjustment for obstruction unless it resulted in a material hindrance to the official investigation or prosecution of the instant offense or the sentencing of the offender."

[6] *See* Pete Brush, Law360, "Wolf of Airbnb' Cops to Defrauding Landlords in Room Scam," available at https://www.law360.com/real-estate-authority/articles/1692904 (last visited January 18, 2024).

[7] *See* Larry Neumeister, AP, "Self-professed 'Wolf of Airbnb' pleads guilty to wire fraud for defrauding landlords," available at https://apnews.com/article/airbnbwolf-konrad-bicher-plea-wire-fraud-d0c1ef530598d0668ee8eb8499f0adf8 (last visited January 18, 2024).

On December 29, 2022, the defendant filed a motion to sever Count One of the Indictment (i.e., the count relating to the Rental Property Scheme) from Count Two and Count Three (i.e., the counts relating to the PPP Scheme and associated aggravated identity theft). The Government opposed, and the Court denied the motion on March 7, 2023. (Dkt. 35). Thereafter, on June 26, 2023, the defendant pled guilty to the one-count Information, which considered the Rental Property Scheme and the PPP Scheme as a single fraud scheme, pursuant to the Plea Agreement.

In the Plea Agreement, the parties agreed to an offense level of 22 and Criminal History Category II, resulting in the Stipulated Guidelines Range of 46 to 57 months' imprisonment. In the PSR, Probation calculated that the defendant had four criminal history points, and therefore should be in Criminal History Category III, resulting in the PSR Guidelines Range of 51 to 63 months' imprisonment. However, in light of the 2023 updates to the Guidelines Manual, the defendant is no longer eligible for two additional criminal history points pursuant to what had been U.S.S.G. § 4A1.1(d). Therefore, the correct calculation of the defendant's Guidelines range is the Stipulated Guidelines Range, i.e., 46 to 57 months' imprisonment.

**C. Discussion**

1. <u>Applicable Law</u>

As the Court is well aware, the Guidelines continue to provide guidance to sentencing courts following *United States v. Booker*, 543 U.S. 220 (2005), and *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005). Because the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall v. United States*, 128 S. Ct. 586, 594 (2007), district courts must treat the Guidelines as the "starting point and the initial benchmark" in sentencing proceedings. *Id.* at 596. After that calculation, the Court must consider the seven factors outlined in Title 18, United States Code, Section 3553(a), which include the nature and circumstances of the offense, the individual characteristics of the defendant, and the need to adequately deter criminal conduct and promote respect for the law. *Id.* at 50 & n.6. To the extent the Court imposes a sentence outside the Guidelines range, it must "consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc) (quoting *Gall*, 552 U.S. at 46).

2. <u>A Sentence of At Least 51 Months is Reasonable and Appropriate</u>

As the above factual summary makes clear, a sentence within the Guidelines range is necessary in this case. The defendant engaged in a long running fraud scheme. He continued the scheme knowing that it was wrong and exploitative of his victims, and even knowing that his victims were willing to sue in order to stop his conduct. He executed the scheme through lies and deceit in connection with government programs and protections intended for the most vulnerable in society during one of the greatest crises in this city's and country's history. The defendant looked at one of the greatest economic and public health crises in history and saw dollar signs and an opportunity to steal. Therefore, the requested sentence is required to reflect the seriousness of the offense.

It is also critical that the sentence imposed promote respect for the law and afford adequate deterrence – both general deterrence and, extremely importantly in this case, specific deterrence as well. The Government has grave concerns about the defendant's lack of remorse and the likelihood that he will reoffend. First, this is not the defendant's first conviction. As explained in the PSR, the defendant has two prior state court convictions for larceny. One of those convictions relates to an incident in 2015 where the defendant "impersonated a realtor to obtain payment for a dwelling that was not his to rent or lease," including by "post[ing] an advertisement for an apartment via the internet." (PSR ¶ 41). The defendant did not receive a prison sentence for that conviction. This conviction did not stop the defendant from continue to engage in similar criminal conduct. In this regard, it is also important to note that the defendant's communications with CC-1 suggest that he had been illegally renting apartments on Airbnb for at least two and a half years prior to July 2019 – in other words, there is reason to believe that the defendant never stopped committing crimes for a material period of time after his 2015 arrest and conviction.

Second, the defendant's words and actions suggest that he is indifferent to his crimes and finds his legal predicament amusing. He bragged to the media about being the "Wolf of Airbnb" – an unambiguous reference to another famous fraudster – and laughed with his friends about bragging about it to the media. Even the defendant's explanation for the moniker – that he is someone who is "hungry and ruthless enough to get on top of the financial ladder" – demonstrates his inability to grasp that "hunger" and "ruthlessness" do not justify lies and deceit. Even after his guilty plea, the defendant quipped that he had a "fantastic story" to tell. And in his sentencing submission, he continues to blame others – including his victims – for his own wrongful conduct.

In sum, before the Court is a defendant who continued a fraudulent scheme for years, even after being brought to court by his victims who were seeking to stop his conduct, and whose scheme included lying in court proceedings and on governmental forms in order to take advantage of the unfolding tragedy of the Covid-19 pandemic. This is a defendant who has previously been convicted of engaging in similar behavior, and who bragged about his conduct and notoriety to friends and media. In light of these circumstances, the Court should impose a significant sentence within the Stipulated Guidelines Range. The sentence requested by the Government and recommended by Probation, 51 months' imprisonment, is the appropriate sentence in this case.

### D. Conclusion

For the reasons set forth above, the Court should impose a sentence within the Stipulated Guidelines Range, specifically 51 months' imprisonment.

Respectfully Submitted,

DAMIAN WILLIAMS
United States Attorney

By: ___/s/_____
Matthew Weinberg
Assistant United States Attorney
(212) 637-2386

cc: Howard Schumacher, Esq. (by ECF and Email)